Our next case for this morning is Lewert v. P.F. Chang's China Bistro. Mr. Siprit. Good morning, Your Honors, and may it please the Court, Joe Siprit on behalf of the appellant, that's plaintiff in the class below. I'd like to think that hopefully my job this morning is a little easier, given that we have the benefit of the Court's recent, very recent opinion in, of course, the Neiman Marcus case. I think Neiman is directly on point, truly. Just like in Neiman, here there is no dispute, or we have alleged certainly, that a large security breach occurred that compromised massive amounts of payment card info. In fact, in Neiman, it was around 300,000, 400,000. Here, it seems to be more like 7 million, but certainly massive. Do you think we need, either for purposes of standing or for purposes of something else, fact finding on the question whether the data was stolen exclusively from the 33 stores that P.F. Chang's is talking about? In which case, since these plaintiffs didn't patronize any of those stores, I'll just say different measures might be necessary. Or do you think that there's enough in this record right now to say that maybe the scope of the breach was beyond that? There is absolutely enough in the record right now to say the scope of the breach is not limited to the 33 stores that P.F. Chang's claims unilaterally, and contrary to the pleadings, were involved in the breach. And in fact, even P.F. Chang's, in making that unilateral statement, had plenty of caveats that did not limit it to 33 stores forever, written in stone, if you will. In fact, the language was to the effect of, you know, 33 stores, investigation continues, we're still trying to figure it out. So they, right now, a year later since that statement was made, may know that there are more stores involved than the 33. Of course, we, the plaintiffs, don't know that because we haven't gotten to discovery yet. What really matters is that we have alleged the breach occurred, the compromised info was payment card information for millions of people. Our plaintiff, in addition to other class members, but our class representative plaintiff, had actual unauthorized activity on his account. Mr. Siprit, your briefing seems to assume that if you allege it, that's good enough for standing. Is that your understanding? It being an unauthorized transaction, Your Honor? A breach of these plaintiffs' data? Yes. Well, the problem I have with that is that since standing is a matter of the court's subject matter jurisdiction, it can be challenged as a factual matter. And so, I'd like to go back to Chief Judge Wood's question about a need for fact finding. The defense is telling us, they didn't really tell the district court quite as clearly as they could have, but it certainly seems like there might be a need for fact finding as to whether your named plaintiffs actually suffered any breach of their data. Well... Before a standing decision can be made. Perhaps. I'm not telling the court or suggesting that that is a theoretically impossible thing to do. However, I would think that out of all the instances in which fact finding for subject matter jurisdiction on an Article III challenge were to potentially take place, this would not really be the right situation for that. Could I, as you're answering Judge Hamilton's question, there's some discussion in the briefs about whether P.F. Chang's has raised a facial challenge to standing, which might be one thing, or the kind of factual challenge to standing that we're talking about right now. Yeah, it's really a two-fold answer, I think, so I'll try to be as clear as possible. On the one hand, even if we accept the premise, which I don't and I'll return to this, but even if we accept the premise that you can't have standing unless you as a class member were at the 33 stores that P.F. Chang's claims involved the breach, and not anything more than those 33, even if that was the premise, I don't see how you get around a fact-intensive investigation as to what that even means. Is it 33? Is it 34? How do they know that? It's going to be the subject of expert discovery. It's not like P.F. Chang's can just put in an affidavit and say it was 33. I mean, we don't agree with that. No, I mean, I thought that as well. I mean, I can't believe each store has its own independent computer network, and so if there's a central computer network, I don't know how the files are organized. I don't know how firewalls exist. It seems very easy for me to see that there might be a substantial number of factual questions. I guess my only issue is if it's a facial challenge right now, then we'll resolve it facially, but there may be further exploration necessary at the district court level, the kind of fact-finding to support Article III authority that Judge Hamilton was talking about. Yeah, if there is fact-finding to be done in that regard, it would be nothing more or less than what you would expect to see full-blown discovery at the trial court below look like if the case were to proceed on the merits. I mean, the amount of discovery and investigation and empirical analysis done by experts on this very issue is largely what merits discovery is going to look like. So I guess we could do that now, or we could embark on that, but that seems to me to be sort of defeating the whole purpose of making an initial threshold fact-finding on this issue, which is to sort of nip it in the bud or crystallize the issue. I just don't see how that's possible as a practical matter here. The other point, though, and I said I would challenge the premise of P.F. Chang's, what I meant by that is that we don't really accept that only the people who were involved in the 33 stores have standing. I mean, again, indulging the fiction that it turns out to only be 33 and not anything more, what about the people who shopped at P.F. Chang's during the time of the breach who received notice that their information was compromised? They don't yet know if they're in or out of the 33, because even P.F. Chang says it might be more, it might be less, we're still investigating. So that reasonable person gets that information, calls their bank, spends time on the phone, monitors their accounts, deactivates their credit card, gets a new one, spends money on identity theft protection, as our plaintiff did. If it turns out after all the smoke clears too later that, lo and behold, he was at the 35th store, not the 33, would it really matter? I don't think it would. It sounds like you're describing modern life. I mean, those things happen. If you're simply worried about the integrity of your data, those are all steps you might take, and it's nice to find somebody else to pay for those rather modest expenses, but it's hard for me to see how somebody whose data was not actually compromised has the kind of claim that the federal courts ought to cover. Well, that's exactly the point, though. The information was compromised. Well, that's the conclusion that you're assuming here. Suppose you've got a retail credit card with an XYZ Corporation, and XYZ announces, we are upgrading our data security. And as a customer, you say, upgrading? It must not have been very good before. So I'm going to take all these precautionary steps. I'm going to ask for a new credit card. I'm going to buy the insurance and the monitoring services and so on. Do I have a claim? You do not. What's the difference? The difference is whether you're on one side or the other of the Article 3 threat of imminent harm, reasonable apprehension line. I've got perfectly good reasons to worry. They're upgrading. They couldn't have been doing this properly before. Your arguments would seem to apply just as strongly. Respectfully, I don't think so. Whether a person in that situation decides to spend their own money and time to do these things could be the right or wrong decision for them. It might be reasonable. It might not be. But they don't have a claim. And the reason they don't have a claim is because under the court's current jurisprudence, and that includes Neiman specifically, that's not good enough for Article 3 standing. There is no claim against the company. Whereas, by contrast, under the court's current jurisprudence, and again, Neiman crystallizes this, if an actual data breach occurs and notice goes out to people and it says, Sir, we're sorry to tell you, but your card was in a data breach that was compromised, $300,000,000, $400,000,000, $400,000,000, whatever the number is, you're one of them potentially. If that person, without knowing anything more, says I better call my bank, I better deactivate my card. Clearly, if there's an indication that the individual's information was compromised, Neiman Marcus applies. No doubt about that. And you say because, A, there's the evidence of the breach, from all the press releases there can't be any doubt about that, and B, because at least one of your named plaintiffs shortly after the breach experienced unauthorized activity on the card that he used at P.F. Chang's, that at least for purposes of Article 3 is enough to get you over the line to let the case go forward. That's precisely correct, Your Honor. That does seem like a step beyond Neiman Marcus, however, a significant step in broadening liability, if simply the possibility that my data has been compromised gives me a claim. At least at this stage, Your Honor, we don't need to go beyond Neiman Marcus to win outright, and the reason for that, I think, is because the whole issue of whether the breach was, in fact, limited to 33 stores, which would exclude our class representative, that really is a fact issue. So at most. So you're saying that's a statement of a claim issue. You could lose on the merits, of course. I would say that, and this is, I guess, the Judge Hamilton's point, but also in response to your point, Your Honor, it is possible that this court could see this issue again down the road after summary judgment or perhaps after a trial. When we're debating whether or not the breach should include or the scope of the breach should be deemed to include people outside the 33 stores. If, again, we actually establish that as a factual matter, and then if it's limited to 33 factually two years from now, and if my class representative is outside that scope, then the legal question or the legal issue that, Judge Hamilton, you're putting your finger on would be crystallized. For today, however, I think my job is a little easier because truly it is a fact dispute. I mean, frankly, the very fact that our plaintiff had his accounts compromised, he's never had a fraudulent transaction attempted ever on that account, and one week before P.F. Changs announces the breach, someone is trying to go into his account and steal his information or steal his money from the account, to me that strongly suggests that actually the scope is bigger than P.F. Changs indicated. And, frankly, we would have to find out in discovery if even they would admit that their initial estimate of the scope might have been a little bit low and maybe now it's broadened. Those are classic fact issues. We have to get to the bottom of that in discovery. For now, the only point is, have we alleged enough for Article III standing to simply go forward on our case? The answer is yes, by a long shot, under the standard just given to us by Neiman Marcus. Okay. Thank you. Thank you, and I'm sorry I eclipsed my time. I did try to reserve a little for everybody. I think you've used it, so we'll see. Thank you, Your Honors. Mr. Kardasikis. Thank you, Your Honor. May it please the Court. John Kardasikis representing Appellee P.F. Changs, China Bistro, Inc. Internally, we refer to this case as the Sprinting Bystanders case. What happened factually, as alleged and demonstrated by the record, is that on June 12, 2014, P.F. Changs issued a public statement indicating it had learned of a security compromise that affected some of its restaurants. But we have the press release. We've read it. Sure, and one of the ways this distinguishes our case from Neiman Marcus and many of the other high-profile breaches is, in some cases, a retailer can have a breach at the corporate level that may expose information regarding all of the retail's customers. That was not the situation here. That is not what is described in the press release. Let me back up and figure out the extent to which we are being faced right now with a facial challenge to the standing of these potential class representatives and the potential class, and to what extent we're looking at a factual challenge. In a way, it has morphed. What we did was we filed in the district court a 12B6 motion, and our argument was that plaintiffs had failed to allege sufficient facts to show. . . Right, you made a Twombly-Iqbal kind of motion. Correct. So we had a facial challenge. In response, the plaintiff was obviously concerned that they weren't going to fare well with the record as it existed, and then they filed the affidavit of Mr. Kozner addressing. . . Was it Mr. Kozner or Mr. Lippert? I'm not sure I'm telling you the right person who filed the affidavit. Mr. Kozner's affidavit addressing that, and he adds additional facts. And notably, we knew from the complaint of Mr. Luerk that he had only eaten at one location, which wasn't one of the three, and then when we had the affidavit from Mr. Kozner. . . Thirty-three. Thirty-three. And then when we had the affidavit from Mr. Kozner, we knew that he also had only eaten at one of the stores, and not one of the 33 stores. But see, here's one of my questions about that. I mean, I guess it's possible, you know, that a restaurant or, you know, a small retailer that's part of the national chain might have its own internal computer network, but I would be rather surprised about that. It seems much more likely to me that there's a corporate-wide network and maybe things are uploaded to it every day. I don't know how it works. But at the level of are they required to accept your estimate of how many stores or how many restaurants, whatever you want to call them, are at issue, I don't know why this uniquely among all contested facts in litigation is something they just have to take your word for at this stage. Well, the record before the court is we made our announcement on June 12th. Thirteen days later, Mr. Lewert files his suit, and the only investigation suggested by the complaint is our press release. This is based on our press release. Sure. And so this is your 12B6 theory, but I'm going to remind you that at least as far as I can tell, you didn't file a cross-appeal. This case was dismissed without prejudice on standing grounds. Correct. A dismissal with prejudice would give you more relief than a dismissal without prejudice. It would have race judicata effects and the like. A dismissal without prejudice could be cured within the statute of limitations period with a new lawsuit. So you can't get more than you got without a cross-appeal. So in my own mind, there's a big difference between whether there's Article III standing on the one side and whether a claim has been stated on the other side. And I think the Neiman Marcus case makes that very clear. It says maybe there's standing, but you may just fail to state a claim on which relief can be granted. And I recognize you were trying to preserve both things, but at this stage we're just looking at standing. As I understand it, the court could affirm on either. No, I'm telling you we can't. We cannot. They're different, with different consequences. Right. We cited the Slaney case for the proposition that the court could affirm on any ground. I understand you're killing me. In general, that is true. That is not true when you're talking about standing dismissal, as Judge Wood explained. Let's move on. Right. I'll just quickly explain. You can affirm on any ground that would support the same relief that the district court, the same judgment that the district court entered, and that's not your situation, so you can press on. Yes. So what I was explaining was the security breach here involved malware loaded onto basically the equipment at particular stores. That's all we announced. He filed his complaint based on our announcement. That's why we call him the sprinting bystander. He didn't wait to do any more investigation. He didn't make any inquiries suggested by the complainer or otherwise to figure out, well, which stores were those? Was he involved? And interestingly, Mr. Lewert doesn't allege that he suffered any harm whatsoever. His complaint is very clear in saying that he was worried that members of the class suffered unauthorized bank charges. That's paragraph 33 of his complaint. He doesn't allege he suffered any harm whatsoever. He clearly is nothing more than a bystander wanting to pursue a claim, just as he did against Videndi in the other litigation where he was the class rep in cyber breach litigation in California. He wanted to rush to the courthouse. He wanted to be the class rep to pursue these claims, even though he was nothing more than a bystander. Well, if we accept, you know, I'm looking at the press release, and I appreciate your attaching it to your brief. In the exercise of caution, and this was probably very prudent, of course, P.F. Chang switches to the manual processing system at all of its branded restaurants located in the continental United States, just trying to figure out, of course, at the stress preliminary stage of the investigation, everybody should be vigilant, check your credit cards. And then there's the update, August 4, that gets more specific. That's the first one that mentions the 33 locations we're still investigating. So, you know, using disparaging terms about plaintiffs doesn't really help our analysis too much. I'm not trying to disparage. I'm just trying to portray an accurate record of the chronology here. Well, you think he's a bystander. He says, you know, and again, this is a little bit about Clapper, you know, how much does it take to get from the possible to the probable or the substantial risk of harm? Somebody whose data has been, in fact, compromised in the immediate aftermath of this may have reason to think that there's a link. Well, clearly what he does is he cites to our press release that says some stores. In his complaint, he makes no allegation that he challenges that. He doesn't suggest that he thinks that's a false statement, that it was only some stores. He doesn't allege anywhere that he thinks this breach was, in fact, company-wide. But it's stores sprinkled all over the United States. It's a funny list if you look at the list of the stores. Yes, Your Honor. Counsel, given the logic of Neiman Marcus, I guess I don't understand why somebody can't have standing by just saying, I've read this P.F. Chang press release, I've been a customer, I've got a reasonable fear that my data has been compromised, so I'm going to take these precautionary measures. Well, is it a reasonable fear if P.F. Chang says we've had 33 stores that have had a problem and you didn't dine at one of those 33 stores? Well, first of all, the June press release doesn't tell me which stores. It says we don't know how extensive this is. You are taking precautionary measures all over the United States. Why isn't it reasonable for your customers to take similar precautionary measures? What happened was on June 10, the Secret Service tells us there's a problem you have to investigate. State law requires us to give prompt notice. Could you answer my question? Yes. So June 12, we give notice saying what we know at that time as we do the investigation. But what's the answer to the actual question, Judge Hamm? I'm interested in that answer as well. Well, I come back to if your data was never at a store that was subject to the breach. No, my answer to your question would be no. Precautionary measures, protective measures for someone whose data has been compromised can give rise to an actionable injury. Here we've got a press release from your client saying our data has been compromised for our customers. We don't know how extensive it is. We're taking nationwide precautionary measures. Why is it not equally reasonable for your customers to take precautionary measures until they have some assurance that their data was not compromised? Judge Darragh correctly cited the rule regarding standing when he cited Hine v. Freedom from Religion, and it requires a concrete and particularized injury in fact having occurred. Okay. Are you disagreeing with Neiman Marcus then? No. What I'm saying is our case is distinguishable from Neiman Marcus because in Neiman Marcus the claim was that the breach affected all of those customers, not just some. Right. But given the nature of the injuries that were acknowledged in Neiman Marcus, if your client announces your data, and that press release basically says to all customers throughout the United States, your data may be compromised. We don't know. We don't know. We're still investigating. And data thieves are going to be working faster than your investigation. Okay? So why shouldn't I go ahead and protect myself in the way that Neiman Marcus says is compensable? With no further investigation, there's no imminent threat to you. There's no claim here. Okay. I understand your answer. All right. And your time is up, so we thank you very much. Thank you. And you also used up all of your time, so we will take this case under advisement.